UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                         :

JOSEPH A. GIRGIS, *et al.*,         :

                          :      CASE NO. 1:10-CV-00590
           Plaintiffs,      :

                          :

vs.                         :      OPINION & ORDER
                          :      [Resolving Doc. Nos. 30, 39, 40 & 41]

COUNTRYWIDE HOME LOANS, INC.,  :
*et al.*,                         :

                          :
           Defendants.      :

                          :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendants Countrywide Home Loans, Inc. ("Countrywide") and Bank of America Corp. ("Bank of America") move this Court for summary judgment. [Doc. 30.] Plaintiffs Joseph Girgis and Nermine Girgis oppose the motion. [Doc. 39.] The Defendants replied. [Doc. 41.] The Defendants also move to strike the affidavit of Plaintiff Joseph Girgis, filed in support of the Plaintiffs' reply memorandum. [Doc. 39-1; Doc. 40.]

For the following reasons, the Court **GRANTS** the Defendants' motion for summary judgment.

**I. Background**

Plaintiffs Joseph and Nermine Girgis sue Defendants Countrywide and Bank of America, alleging that the Defendants engaged in various predatory and loan servicing practices targeted at unsophisticated buyers. [Doc. 1-1.] The Girgises bring this suit as a putative class action, on behalf

-1-

Case No. 1:10-CV-00590
Gwin, J.

of themselves and all other Ohio residents for whom the Defendants originated and/or serviced loans in the past four years.  The Plaintiffs have yet to file a Motion for class certification and the case proceeds on a non-class basis.  [Doc. 35.]  This particular dispute arises out of several sizeable mortgages that the Girgises obtained from Defendant Countrywide for two condominiums located at 19333 Collins Avenue, Sunny Isles Beach, Florida.  [Doc. 30-1 at 3-4; Doc. 39 at 2.]

The Girgises purchased the first condominium unit ("Unit 808") in late 2006.  [Doc. 30-1 at 1; Doc. 39 at 2.]  They agreed to pay $1,275,000 for this unit and intended to use it as a vacation home and potential rental property.  [Doc. 30-1 at 3; Doc. 39 at 2.]  The Plaintiffs obtained financing from Defendant Countrywide for the purchase of Unit 808.  The financing came in the form of two mortgages – the first in the amount of $1,000,000 and the second in the amount of $147,500.  [Doc. 30-1 at 3; Doc. 39 at 2-3.]  The Girgises rented this property to a tenant during the winter of 2006/2007.  [Doc. 30-1 at 4.]

In April 2007, the Girgises purchased a second condominium unit at the same address ("Unit 1101").  [Doc. 30-1 at 4; Doc. 39 at 2-3.]  The Plaintiffs Girgises agreed to pay over $1 million for Unit 1101.  They intended to used this unit as both a vacation home and potential rental property.  [Doc. 30-1 at 4; Doc. 39 at 2-3.]  The purchase of this property was also financed through two mortgages from Defendant Countrywide – the first in the amount of $920,000 and the second in the amount of $115,000.  [Doc. 30-1 at 4; Doc. 39 at 2-3.]  Although Joseph Girgis admits that he did sign the mortgage, the Girgises allege that mortgage was fraudulently notarized and witnessed.  [Doc. 39 at 6.]

The Plaintiffs also allege that they did not qualify for the mortgages that they used to finance the purchase of the second condominium unit.  [Doc. 39 at 2-3.]  The Plaintiffs claim that

Case No. 1:10-CV-00590
Gwin, J.

Countrywide falsified information so the mortgage used to purchase Unit 1101 could be approved. [*Id.*] Specifically, the Plaintiffs allege that the Defendants falsified a lease on Unit 808 (the first unit purchased) and used the falsified rental income from that lease to ensure approval of the loans. [*Id.*] The Defendants dispute these allegations and claim that the Plaintiffs were approved for both mortgages under all of Countrywide's applicable guidelines for determining mortgage eligibility. [Doc. 30-1 at 5.] For example, the Defendants point out that the Girgises had an income in excess of $1 million, had excellent credit ratings, and had a sizeable bank account at Key Bank. [*Id.*]

On October 7, 2009, a change in local maps indicated that the address containing the two condominium units was located in a flood zone, necessitating flood insurance on both units. [Doc. 30-1 at 6.] A flood insurance policy was placed on both properties by Bank of America Home Loans[1] in the amount of $5,878.13 (for each unit) and was charged to the Plaintiffs' escrow account. [Doc. 30-1 at 6; Doc. 39 at 3-4.] On December 17, 2009, the Girgises provided Bank of America Home Loans with documentation showing that the Girgises had already purchased a flood insurance policy and the charges were credited back to the account. [Doc. 30-1 at 6; Doc. 39 at 3-4.] Saying it could not verify that the Girgises had flood insurance, Bank of America Home Loans purchased a policy and charged premium of $5,878.13 to the Plaintiffs' escrow account on January 4, 2010. [Doc. 30-1 at 6; Doc. 39 at 3-4.] On January 15, 2010, the Plaintiffs again verified their flood insurance and the premium was refunded for a second time. [Doc. 30-1 at 6; Doc. 39 at 3-4.] On April 15, 2010, the Plaintiffs' flood insurance policy on one of the units expired and Bank of America Home Loans requested updated documentation. [Doc. 30-1 at 6; Doc. 39 at 3-4.] The

---

[1] Bank of America Home Loans is a subsidiary of Bank of America that formerly conducted business as part of Countrywide Financial Corporation.  Bank of America purchased the Countrywide Financial Corporation in July, 2008.

-3-

Case No. 1:10-CV-00590
Gwin, J.

Plaintiffs timely provided such documentation, but a computer error by Bank of America Home Loans resulted in the charging of $223.02 for a gap policy to the Plaintiffs' escrow account. [Doc. 30-1 at 7; Doc. 39 at 3-4.]  The gap policy was canceled and the premium was refunded to the escrow account soon afterwards. [Doc. 30-1 at 7; Doc. 39 at 3-4.]  The Plaintiffs did not write any letters to Bank of America Home Loans regarding these insurance issues, although they did repeatedly provide documentation of their existing flood insurance policies.  [Doc. 41 at 8.]

As has often been case over the past several years in the housing market, the Girgises came to regret their decision to purchase the two condominium units.  In 2006, Joseph Girgis earned over $500,000 and in 2007 and 2008 his income was reported at over $1 million. [Doc. 30-1 at 5-6.] However, in 2009, Joseph Girgis's income dropped to under $200,000. [Id.] Due to their reduced income, the Girgises began to have trouble making payments on their four mortgages and the property value of the condominium units also declined precipitously, making them difficult to sell or lease.

On February 3, 2010, the Plaintiffs filed suit in the Court of Common Pleas for Cuyahoga County, Ohio, alleging eighteen causes of action arising from alleged servicing and origination violations. [Doc. 1-1.] On March 19, 2010, the suit was removed to the Northern District of Ohio by the Defendants under 28 U.S.C. § 1441.  [Doc. 1.]  The Court has proper subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1367(a), & 1441(b).

On April 20, 2010, the Defendants filed a motion to dismiss each of the Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). [Doc. 12.] On August 20, 2010, the Court granted this motion in part – dismissing fourteen of the eighteen alleged causes of action. [Doc. 26.] Thus, presently before the Court are the four remaining of the causes of action, namely:  (1) alleged

Case No. 1:10-CV-00590
Gwin, J.

violations of Section Six of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605;

(2) civil conspiracy; (3) breach of contract; and (4) breach of the duty of good faith and fair dealing.

[Doc. 26.]

On September 20, 2010, the Defendants filed a motion for summary judgment. [Doc. 30-1.]

The Defendants say they are entitled to summary judgment on the grounds that: (1) all claims

against Bank of America must be dismissed since it played no role in any of the disputed

transactions; (2) the Plaintiffs' claim alleging violations of RESPA Section Six must be dismissed,

since the Plaintiffs fail to proffer any evidence proving a violation of that statute; (3) the Plaintiffs'

breach of contract and duty of good faith and fair dealing claims must be dismissed since the

Plaintiffs do not identify any contractual provisions that were breached; (4) the civil conspiracy claim

must be dismissed due to the application of the intra-corporate conspiracy doctrine and because all

of the Plaintiffs' other claims fail as a matter of law; and (5) the Defendants have suffered no

cognizable damages. [Doc. 30-1.]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." *Daugherty*

*v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).

The moving party has the initial burden of showing the absence of a genuine issue of material

fact as to an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett,* 477

U.S. 317, 323 (1986). "A fact is material if its resolution will affect the outcome of the lawsuit."

*Martingale, LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004). The moving party meets

Case No. 1:10-CV-00590
Gwin, J.

its burden by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp.,* 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

 Once the moving party satisfies its burden, the burden shifts to the non-moving party to set

forth specific facts showing a triable issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

475 U.S. 574, 587 (1986).  It is not sufficient for the nonmoving party merely to show that there is

some existence of doubt as to the material facts.  *See id.* at 586.  Nor can the non-moving party rely

upon mere allegations or denials of its pleadings.  Fed. R. Civ. P. 56(e).  In responding to a summary

judgment motion, the non-moving party "cannot rely on the hope that the trier of fact will disbelieve

the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a

properly supported motion for summary judgment." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472,

1477 (6th Cir.1989) (internal quotation omitted).

 In deciding a motion for summary judgment, the Court views the factual evidence and draws

all reasonable inferences in favor of the non-moving party. *Thomas v. Cohen,* 453 F.3d 657, 660

(6th Cir. 2004) (citations omitted). "The disputed issue does not have to be resolved conclusively

in favor of the non-moving party, but that party is required to present some significant probative

evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60

Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz.

v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)).  Ultimately the Court must decide "whether the

evidence presents sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Martingale*, 361 F.3d at 301.

Case No. 1:10-CV-00590
Gwin, J.

## III. Analysis

*III.A   Real Estate Settlement Procedures Act*

In their complaint, the Plaintiffs allege that the Defendants violated provisions of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2605 & 2607.  Specifically, the Plaintiffs pleaded three counts under RESPA, alleging violations of both Sections Six and Eight of that act. [Doc. 1-1.]  The Court granted the Defendants' motion to dismiss all of the Plaintiffs' claim alleging violations of RESPA Section Eight because those claims are time barred. [Doc. 26 at 14.]  However, the Court denied the Defendants' motion as to the claims brought under RESPA Section Six.  The complaint alleged a plausible claim for relief under Section Six on the grounds that (1) the Defendants failed to make timely payments of escrow funds and (2) that the Defendants failed to adequately respond to qualified written requests.  [Doc. 26 at 15.]  The Court will consider these alleged violations in turn.

### i.   Failure to Make Timely Payments of Escrow Funds

First, under RESPA Section Six, "servicers who collect funds from borrowers in order to pay taxes, insurance premiums, and other charges [must] make those payments in a timely manner so as to avoid penalties thereon." *Kevelighan v. Trott & Trott*, 2010 WL 2697120, at *4 (E.D. Mich. July 7, 2010); 12 U.S.C. § 2605(g).  The Plaintiffs allege that the Defendants violated this provision by failing to "post payments . . . in a timely manner" and by failing "to make timely payments of escrow funds for casualty insurance premiums and property taxes."  [Doc. 1-1 at ¶ 114.]  Despite these allegations, the Plaintiffs have proffered no evidence indicating that the Defendants failed to make timely insurance or tax payments.  Rather, the only relevant evidence suggests that the Defendants were not justified in repeatedly charging the Plaintiffs' escrow account for flood insurance on the

Case No. 1:10-CV-00590
Gwin, J.

condominium units.  [Doc. 39-11; Doc. 39-12; Doc. 39-13; Doc. 39-14.]

Undoubtedly, Bank of America Home Loans's seeming inability to properly file and account for the Plaintiffs' existing flood insurance policies on the condominiums was highly frustrating. However, improperly charging an escrow account for insurance is not a violation of RESPA Section Six.[2/]  Rather, this provision creates a cause of action where servicers do not timely make insurance or tax payments out of escrow accounts, resulting in penalties to the borrowers.  *See, e.g.*, *Kevelighan*, 2010 WL 2697120, at *4 ("§ 2605(g)  governs when a servicer is required to pay taxes and insurance premiums on a mortgaged property . . . it does not govern when the servicer can collect funds from the borrower for such payments. The section of the RESPA that governs when, what, and how much a servicer may collect from a borrower for deposit in an escrow account is 12 U.S.C.A. § 2609 . . ."); *Sarsfield v. Citimortgage, Inc.*, 667 F. Supp. 2d 461, 466 (M.D. Pa. 2009) (stating that a suit alleging violation of 12 U.S.C. § 2605(g) must prove that the servicer failed to make proper payments of insurance or taxes).  Thus, the Court finds that the Plaintiffs fail to proffer any evidence showing that the the Defendants violated the provisions of 12 U.S.C. § 2605(g), because none of the disputed charges to the escrow account falls within the purview of this section.

    ii.   Failure to Respond to Qualified Written Requests

Second, under RESPA Section Six, the Plaintiffs allege that the Defendants failed to "timely and adequately acknowledge, investigate, and respond to . . . qualified written requests for information about the servicing of their loans and escrow accounts." [Doc. 1-1 at ¶ 114.]   Under

---

[2/] 12 U.S.C. § 2605(g): "(g) Administration of escrow accounts:  If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

Case No. 1:10-CV-00590
Gwin, J.

this section of RESPA, when a servicer receives a qualified written request, it must – within sixty

days – make appropriate corrections to the account of the borrower or provide the borrower an

explanation for why the servicer's earlier conduct was correct.  12 U.S.C. § 2605(e)(1)-(2).  A

"qualified written request" is a "written correspondence . . . that (i) includes, or otherwise enables

the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the

reasons for borrower's belief that the account is in error . . . or provides sufficient detail to the

servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B)(i)-(ii).

In proving a violation of this provision, the Plaintiffs say that they made repeated "qualified

written requests" regarding the flood insurance policy payments that were debited from their escrow

account throughout late 2009 and early 2010.  [Doc. 39 at 8.]  In response to letters from Bank of

America Home Loans, the Plaintiffs – on several occasions – faxed copies of the flood insurance

policies covering the condominium units.  [Doc. 39-11; Doc. 39-12; Doc. 39-13; Doc. 39-14.]  The

Defendants argue that none of this correspondence is a "qualified written request" and that no duty

to respond to within sixty day deadline set forth in § 2605 arose.  [Doc. 30-1 at 14.]

The Defendants are correct in their assessment.  Simply replying to written requests for

information sent by Bank of America Home Loans is not a "qualified written request" under the

meaning of the statute.  The faxed insurance policies undoubtedly satisfy the first requirement of

being a "qualified written request" – including information that would allow the servicer to

"identify[] the name and account of the borrower."  12 U.S.C. § 2605(e)(1)(B)(i).  The faxed

policies contain the Girgises' names and the fax cover sheets also occasionally contained their

account information.  [Doc. 39-11; Doc. 39-12; Doc. 39-13; Doc. 39-14.]

However, the second requirement of being a "qualified written request" – "includ[ing] a

-9-

Case No. 1:10-CV-00590
Gwin, J.

statement of the reasons for borrower's belief . . . that the account is in error or provid[ing] sufficient

detail to the servicer regarding other information sought by the borrower" – is not met here.  12

U.S.C. § 2605(e)(1)(B)(ii).  The faxed policies contain no requests for information, nor do they

contain statements indicating why the Girgises believed the accounts were in error.  Rather, the

correspondence was directly responsive to Bank of America Home Loan's requests for information

regarding the Plaintiffs' flood insurance policies.  Simply sending copies of requested information

does not constitute a "qualified written request."3/

Since no "qualified written request" was ever sent by the Plaintiffs, no duty arose for Bank

of America Home Loans to reply within the statutory period.  *Jefferies v. Ameriquest Mortg. Co.*,

543 F. Supp.2d 368, 384-385 (E.D. Pa. 2008) (no duty to respond arises if no qualified written

request is sent).  Thus, the Court finds that the Plaintiffs fail to proffer any evidence suggesting that

the Defendants violated 12 U.S.C. § 2605(e).

Accordingly, because the Plaintiffs fail to create a genuine issue of material fact regarding

either of the alleged violations of RESPA Section Six, the Court finds that the Defendants are

entitled to summary judgment on both of these causes of action.

*III.B   State Law Claims*

The Plaintiffs also bring several state law causes of action, namely:  (1) breach of contract;

---

3/ Although there is no binding Sixth Circuit case law on this issue, the Court is of the view that its conclusion is consistent with existing case law from other districts determining whether correspondence with a servicer is a "qualified written request." *Compare Kevelighan*, 2010 WL 2697120, at \*4 (finding a qualified written request where letter included assertion that defendants violated federal law, disputed the existence of a default on a specified mortgage loan, threatened litigation, demanded a reinstatement quote, and requested various information under the heading "Qualified Written Request Under RESPA"), *with Thorian v. Baro Enters, LLC (In re Thorian)*, 387 B.R. 50, 69-70 (Bankr. D. Idaho 2008) (finding that documentation sent in response to a request by the servicer was not a qualified written request where debtor sent (1) a fax cover sheet, indicating the loan number; (2) a letter stating the loan history; (3) a requested payroll statement; and (4) a requested financial statement).  The correspondence here is less detailed even than that sent in *Thorian*, which was found to not be a "qualified written request."

Case No. 1:10-CV-00590
Gwin, J.

(2) breach of the duty of good faith and fair dealing; and (3) civil conspiracy. [Doc. 1-1.] In resolving the Defendants' motion to dismiss, the Court determined that Florida state law should apply to these claims. [Doc. 26 at 21.] The Court maintains its conclusion that the choice of law provision in the mortgage contract should govern and will continue to apply Florida law to the state causes of action. [Doc. 39-5; Doc. 39-6.]

      i. Breach of Contract

Under Florida law, "in order to properly state a claim for breach of contract, a plaintiff must allege the existence of a contract, a breach thereof, and damages as a result of the breach." *De Sterling v. Bank of America, N.A.*, 2009 WL 3756335 at *2 (S.D. Fla. Nov. 6, 2009) (citing *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999)).

The parties do not dispute the existence of multiple mortgage contracts lending the Plaintiffs money for the purchase of condominium Units 808 and 1101. [Doc. 30-1 at 16; Doc. 39 at 6.] Thus, the Plaintiffs satisfy the first element of a breach of contract claim under Florida law.

The Plaintiffs breach of contract claim centers around the argument that the Defendants were "contractually obligated to provide . . . statutorily legal loans and services as promised." [Doc. 1-1 at ¶ 128.] In specifying a specific provision of the contract that was breached, the Plaintiffs point to paragraph sixteen of the mortgages, which reads that "[a]ll rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law." [Doc. 39 at 6.] The Plaintiffs say that the Defendants breached this specific contractual provision by (1) illegally notarizing the mortgage outside of the presence of Plaintiffs and by (2) falsifying a lease of Unit 808 to fraudulently increase the Plaintiffs' income to ensure the approval of the mortgage for the purchase of Unit 1101. [Doc. 39 at 6.] Plaintiff Joseph Girgis alleges in an affidavit, submitted

-11-

Case No. 1:10-CV-00590
Gwin, J.

as an exhibit, that he did not execute or sign the lease used by the Defendant Countrywide in

approving his mortgage for Unit 1101 and that the witnesses who signed the mortgage were not

present at the closing.  [Doc. 39-2; Doc. 39-6.]

However, the Plaintiffs' argument that the Defendants breached the contract by allegedly

illegally notarizing the mortgage note and by falsifying the lease information used to approve the

mortgage is not availing.  The Plaintiffs do not allege any factual circumstances that would constitute

a breach of a specific provision of the mortgage contracts.  The provision of the mortgages that the

Plaintiffs say that Defendants violated is a run-of-the-mill choice of law and severability clause.

Paragraph sixteen of the mortgage reads:

> This Security Instrument shall be governed by federal law and the law of the
> jurisdiction in which the Property is located.  All rights and obligations contained in
> this Security Instrument are subject to any requirements and limitations of Applicable
> Law.  Applicable law might explicitly or implicitly allow the parties to agree by
> contract or it might be silent, but such silence shall not be construed as a prohibition
> against agreement by contract.  In the event that any provision or clause of this
> Security Instrument or the Note conflicts with Applicable Law, such conflict shall not
> affect other provisions of this Security Instrument or the Note, which can be given
> effect without the conflicting provisions.

[Doc. 39-5; Doc. 39-6.]

The Plaintiffs argue that by including a provision in the mortgage that states that the contract

is subject to "applicable law," that the Defendants promised to act at all times in accordance with

the law.  In essence, the Plaintiffs are saying that the choice of law provision in paragraph sixteen

of the mortgages incorporates "the law" generally; since the Defendants allegedly violated the law

by falsifying Plaintiffs' income and by illegally notarizing the mortgage, the Defendants thereby

breached the express terms of the contract.  However, the choice of law provision is meant to dictate

the law that will govern disputes related to the mortgage – it is not meant to incorporate the law at

Case No. 1:10-CV-00590
Gwin, J.

large.  "Where words of a contract are clear and definite, they must be understood according to their

ordinary meaning." *Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc.*, 609 So.

2d 66, 68 (Fla. Dist. Ct. App. 1992).  Since the ordinary meaning of this choice of law clause is clear,

the Defendants argument on this point fails.[4/]  Because the Plaintiffs fail to proffer any evidence

indicating that the Defendants breached the mortgage contracts, the Court therefore grants the

Defendants' motion for summary judgment on the breach of contract claim.[5/]

This conclusion is not to say that the conduct of Defendant Countrywide – if proven true –

is not illegal or possibly actionable.  Rather, the Plaintiffs allegation that forged leases were used to

induce them into entering into a mortgage they could not afford states facts that could potentially

support a claim for fraudulent misrepresentation,[6/] negligent misrepresentation,[7/] or a defense to

---

[4/] In a factually similar case, in *Wong v. American Servicing Co., Inc.*, 2009 WL 5113516 (E.D.Cal. Dec. 18, 2009), the district court reached a similar conclusion.  In that case, the Plaintiffs alleged, among other things, that the Defendant's loan officer falsified their income to enable the approval of a loan.  *Id.* at *1.  The Plaintiffs brought causes of action alleging breach of contract, fraud, breach of implied covenant of good faith and fair dealing, violations of RESPA, and other claims.  On the motion to dismiss, the court dismissed the Plaintiffs' breach of contract and breach of good faith and fair dealing claims, but did not dismiss the fraud claim.  The Court found that falsifying income to induce the Plaintiffs to enter into a loan that they could not afford to pay back would constitute fraud, but also held that fraudulent conduct during contract formation would not constitute a breach of contract since no contract governed the behavior of the parties during contract formation.  *Id.* at *8-11.  Although this case was decided under California state law, Florida law is similar on the relevant claims and the case is instructive.

[5/] Since no contractual provision was breached, the Court declines to determine whether the Plaintiffs have proffered evidence indicating that they suffered damages due to the alleged breach.

[6/] "To state a cause of action for fraudulent misrepresentation, a plaintiff is required to allege the following elements in the complaint:  (1) a misrepresentation of a material fact; (2) which the person making the misrepresentation knew to be false; (3) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (4) that the person relied on the misrepresentation to his detriment; and (5) that this reliance caused damages." *Romo v. Amedex Ins. Co.*, 930 So.2d 643, 650-51 (Fla. Dist. Ct. App. 2006).

[7/] In order to state a claim for negligent misrepresentation under Florida law, a plaintiff must allege that "(1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation." *Baggett v. Electricians Local 915 Credit Union*, 620 So.2d 784, 786 (Fla. Dist. Ct. App. 1993).

Case No. 1:10-CV-00590
Gwin, J.

formation of the mortgage contract.[8/]  However, as the Defendants point out, the only evidence proffered by the Plaintiffs to support this assertion of fraud is an affidavit submitted by Plaintiff Joseph Girgis.  [Doc. 39-1.]  In his affidavit, Girgis states that he has no knowledge of the lease document used by Countrywide to verify rental income from Unit 808, that the signature on the lease is not his, and that he had never seen the lease before.  [*Id.*] Yet, in his deposition, Girgis states that he mailed the lease to Countrywide and that the signature on the lease is his own.[9/]  [Doc. 41-3.]

---

[8/] "§ 164 When a Misrepresentation Makes a Contract Voidable: (1)  If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."  Restatement (Second) Contracts § 164.

[9/] Joseph Girgis testified:

Q.     Okay. Did you end up renting the 808 property?

A.     We did rent during the winter season because that's the time we're less likely to use it and it usually rents around four or five months in the winter.

Q.     So you did rent it for the winter, '06, '07 winter months?

A.     That's true . It was already actually like the rent was already available on it when we took it so we just had to let the rent go.

Q.     The rental agreement was already in place when you bought the property?

A.     Something like this, because the people, they rented every year and they were available to rent it again, sort of, yes.

. . .

Q.     Right.

A.     And I would not send a document that I have not signed on.  I see here it says I'm enclosing a lease agreement, but I would not enclose something not with my signature.

Q.     Let's go back to Exhibit 9, the letter.

A.     Yes, sir.

Q.     At the time that you signed this letter, was the information in the letter accurate?

A.     I was intending to lease it [Unit 808], you know, and put it for sale; that part, I remember yes.  You know, that was my intentions with it.  The part, in January, I was proposed with an offer to rent the unit for one full year, you know, again, give me one second, sir, let me take a look at this lease here.  This thing is supposedly signed by Hector Garcia and me in April, so I have no idea where that January

(continued...)

-14-

Case No. 1:10-CV-00590
Gwin, J.

Although the Court is not supposed to weigh evidence or "determine the truth of the matter" on summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (U.S. 1986), "a party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony." *United States ex rel. Compton v. Midwest Specialties*, 142 F.3d 296, 303 (6th Cir. 1998). Accordingly, even if the Court now construes the Plaintiffs' allegation as a fraud or misrepresentation claim, the Court finds that there are still no issues of material fact for jury resolution, since the Plaintiffs have proffered no evidence – other than an affidavit giving inconsistent testimony – in support of their claim of fraud.[10] Further, even if the lease was forged, the Court questions whether it had any actual effect on the approval of the Plaintiffs' mortgage. Indeed, the Plaintiffs admit that they were leasing Unit 808 during the period in question and were deriving rental income from it. [Doc. 41 at 12.]

### ii. Breach of Duty of Good Faith and Fair Dealing

---

[9](...continued)
whatever came from. You know, I don't have a good recollection of this.

Q. Okay.

A. I know it has my signature on it.

Q. But according to Exhibit 9, that has your signature on it, was it your intention to rent?

A. Rent or sell.

[Doc. 41-3 at 3, 7.]

[10] Although it is not necessary to reach a determination this issue since the breach of contract claim fails for more fundamental reasons, the Court also notes that the alleged illegal notarization likely does not affect the legality of the mortgage, nor does it likely affect whether the parties remain bound by its terms. *See, e.g.*, *Raymar Dev. Corp. v. Barbara*, 404 So.2d 813, 814 (Fla. Dist. Ct. App. 1981) ("The notarization of a deed or mortgage merely entitles it to be recorded, so as to bind subsequent purchasers, encumbrancers, and creditors without actual notice thereof. The liability of the parties to a mortgage, inter se, is not affected by the absence of notarization or the other forms of proof of execution . . ."); *In re Vance*, 2006 Bankr. LEXIS 553 (Bankr. M.D. Fla. Feb. 13, 2006) (same). The Court also notes that the only evidence proffered supporting this claim is Joseph Girgis's affidavit, which the Court believes is filled with untrue information and was written solely to mislead the Court into finding material issues of fact.

-15-

Case No. 1:10-CV-00590
Gwin, J.

To state a claim for a breach of good faith and fair dealing, a plaintiff must allege "a failure or refusal to discharge contractual responsibilities, prompted not by honest mistake, bad judgment or negligence; but rather by a conscious and deliberate act, which unfairly frustrates the purpose and disappoints the reasonable expectations of the other party, thereby depriving them of the benefits of the agreement." *CFBP, LLC v. Wells Fargo Bank*, 2010 WL 2136535 at *6 (M.D. Fla. May 26, 2010) (*citing Mount Sinai Med. Ctr. of Greater Miami v. Hendrcik & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1313 (S.D. Fla. 2004). Such an implied duty is a part of every contract. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) (citing *County of Brevard v. Miorelli Eng'g, Inc.*, 703 So.2d 1049, 1050 (Fla. 1997)). However, the implied duty of good faith and fair dealing "is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*." *Id.* at 1316-17 (quoting *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414 (11th Cir. 1990)). Moreover, such a cause of action cannot be maintained "(a) in derogation of the express terms of the underlying contract or (b) in the absence of breach of an express term of the underlying contract." *Id.* at 1318 (*citing City of Riviera Beach v. John's Towing*, 691 So.2d 519 (Fla. Dist. Ct. App. 1997)). In other words, a plaintiff "must allege that a specific contractual provision has been breached, causing it damages." *APR Energy, LLC v. Pakistan Power Resources, LLC*, 653 F. Supp. 2d 1227, 1235 (M.D. Fla. 2009).

Here, this cause of action cannot be maintained since the Plaintiffs fail to proffer any evidence indicating that the Defendants breached a provision of the mortgage contracts. As previously discussed, the only contractual provision that the Plaintiffs believe the Defendants breached is the choice of law and severability clause. [Doc. 39 at 6-7.] This claim is not tenable as

Case No. 1:10-CV-00590
Gwin, J.

a matter of law or fact.  Therefore, the Court also dismiss the Plaintiffs' claim alleging a breach of the duty of good faith and fair dealing.

### iii.  Civil Conspiracy

The elements of a claim of civil conspiracy under Florida law are:  (1) a conspiracy between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy.  *Walters v. Blankenship*, 931 So.2d 137, 140 (Fla. Dist. Ct. App. 2006) (citing *Fla. Fern Growers Ass'n v. Concerned Citizens of Putnam County*, 616 So.2d 562 (Fla. Dist. Cit. App. 1993)).  Generally an actionable conspiracy requires an actionable underlying tort or wrong.  *Id.*  However, an alternative basis for a civil conspiracy claim exists where the plaintiff can show some "peculiar power of coercion" possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess.  *Id.*; *see also Fla. Fern Growers*, 616 So.2d at 565.  The essential elements of this tort are a malicious motive and coercion through numbers or economic influence.  *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977).

In their complaint, the Plaintiffs allege that the Defendants conspired together to engage in predatory lending and loan servicing practices for their own financial gain at the Plaintiffs' expense.  [Doc. 1-1 at ¶ 121.]  In support of their claims, the Plaintiffs say that Defendants Bank of America and Countrywide conspired together to fraudulently approve the Plaintiffs application for a loan to be used in the purchase of Unit 1101.  [Doc. 39 at 5.]

This claim fails for a number of reasons.  First, because there is no underlying tort or wrong, the Plaintiffs must rely upon the alternative "peculiar power of coercion" theory of civil conspiracy.

Case No. 1:10-CV-00590
Gwin, J.

Most important, the Plaintiffs were experienced in complex business transactions and were high-income earning professionals, not uninitiated first-time borrowers.  The Plaintiffs show no evidence that they did not otherwise qualify for the loans extended irrespective of the allegedly forged lease.  Beyond a self-serving affidavit that the lease documentation was forged and the allegation that the Defendants conspired together to originate and service illegal mortgages, the Plaintiffs submit absolutely no evidence in support of their claim.  Therefore, because the Plaintiffs proffer no evidence creating an issue of material fact, the claim of conspiracy must fail.

Second, the Plaintiffs submit no evidence connecting Defendant Bank of America to the alleged conspiracy to fraudulently approve the Plaintiffs for their mortgage to purchase Unit 1101.  Beyond two Mortgage Electronic Registration Systems entries listing Bank of America, N.A. as the "investor"on the mortgages, the Plaintiffs fail to link Bank of America to the conspiracy in any way.  [Doc. 39-3; Doc. 39-4.]  In reality, the Plaintiffs are alleging that employees of Countrywide conspired together to illegally approve the Plaintiffs mortgage application by considering the falsified lease income.  However, it is accepted law that a corporation cannot conspire with itself.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 776-77 (1984) (parent and subsidiary cannot conspire with each other); *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115, 1117 (11th Cir. 1986) (agents of a corporation cannot conspire with corporation); *Nationwide Mut. Co. v. Ft. Myers Total Rehab Center, Inc.*, 657 F. Supp.2d 1279, 1291 (M.D. Fla. 2009) (applying intra-corporate conspiracy doctrine to claim brought under Florida conspiracy law).  Thus, not only must the conspiracy claim fail on factual grounds, it also must fail as a matter of law.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Defendants' motion for summary

-18-

Case No. 1:10-CV-00590
Gwin, J.

judgment and dismisses all claims against all Defendants.[11]

       IT IS SO ORDERED.


Dated: October 28, 2010               s/       *James S. Gwin*
                                  JAMES S. GWIN
                                  UNITED STATES DISTRICT JUDGE

---

[11] Since all claims against the Defendants are dismissed, the Court finds that the Defendants' motion to strike the affidavit of Joseph Girgis is moot.  [Doc. 40.]

-19-